UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOHN CAIN**,                                    Case Number 1:13CV1096

    Plaintiff,                                Judge Donald C. Nugent

    v.                                        REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                                Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff John Cain filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated May 15, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI on July 30, 2009, alleging a disability onset date of September 3, 2008, due to severe back problems, chronic pain after falling down six flights of stairs (Tr. 209), and because he was "developmentally delayed" (Tr. 235, 255). His claim was denied initially and on reconsideration. (Tr. 76, 109-10). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 100). The first hearing in this matter, held October 17, 2011, was continued to allow Plaintiff to obtain representation and undergo a consultive examination, and for the ALJ to obtain additional medical records. (Tr. 77-87). On April 30,

2013, Plaintiff (represented by counsel), a vocational expert (VE), and Plaintiff's mother testified at a second hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 18, 41-74). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On May 14, 2013, Plaintiff filed the instant case. (Doc. 1).

## **FACTUAL BACKGROUND**

Plaintiff challenges only the ALJ's conclusions regarding his mental limitations (*see* Doc. 14), and therefore waives any claims about the determinations of his physical impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Accordingly, the undersigned addresses only the record evidence pertaining to Plaintiff's cognitive abilities and mental health.

### **Background & ALJ Hearing Testimony**

At the first ALJ hearing, the ALJ noted Plaintiff's file contained only one medical record, which was an emergency room visit from a year and a half prior. (Tr. 83). Accordingly, the ALJ instructed Plaintiff to obtain counsel and requested he undergo physical and mental consultive exams. (Tr. 43, 83-87).

On April 30, 2012, Plaintiff and his mother testified at a second hearing. (Tr. 41-74). Born March 2, 1988, Plaintiff was 24 years old at the time of this hearing. (Tr. 273). Plaintiff's counsel primarily argued Plaintiff qualified for SSI under listing 12.05(C) due to low IQ scores and depressive and personality disorders. (Tr. 46-47). However, when Plaintiff filled out disability reports, he indicated he could not work strictly because he was "always in pain" from his back injury. (Tr. 236).

2

After being released from prison in 2011, Plaintiff lived with his mom and step-dad. (Tr. 49). Plaintiff had been incarcerated for a probation violation stemming from a conviction for unlawful sexual conduct with a minor. (Tr. 50). Prior to incarceration, he lived with friends and an ex-girlfriend. (Tr. 49-50).

Plaintiff graduated high school in 2008 but testified he had been in special education classes beginning in the first grade and had to repeat fourth grade. (Tr. 49-50, 241, 436). Plaintiff said the last time he took medication was for attention deficit hyperactivity disorder (ADHD) in the fourth grade. (Tr. 51).

Plaintiff had two short-term jobs. (Tr. 237). In 2007, Plaintiff worked at Pet Supplies Plus for two weeks as part of a vocational assistance program. (Tr. 51). With the assistance of a job coach, Plaintiff stocked shelves, cleaned shelves, and mopped the floor. (Tr. 52). Plaintiff also testified he worked at Digital Jet Stream for two weeks, where he "look[ed] up stuff on the computer" and cleaned out stereo systems. (Tr. 52). Plaintiff did not have a driver's license and took public transportation, but said he needed assistance at times. (Tr. 53-54).

Concerning daily activities, Plaintiff performed chores at home, such as doing dishes, sweeping, and cleaning cat boxes. (Tr.54). Plaintiff said he spent most of his day playing video games. (Tr. 55). Plaintiff's mother testified Plaintiff could take care of his personal care but needed a reminder to take a shower on occasion. (Tr. 57). He could prepare small microwavable meals. (Tr. 58). She said Plaintiff read at about a third or fourth grade level but could "carouse" the internet. (Tr. 59). Plaintiff's mother said he could live on his own but she would have to help supervise his bills. (Tr. 60). However, shortly after she said she wasn't sure if he could live on his own because he could not manage his money. (Tr. 61). When pressed, Plaintiff's mother said

she "could see him getting a check and the first thing he wants to do is go out and blow it, and he wouldn't worry about paying his bills or even putting food on the table before he would find some ridiculous thing to buy." (Tr. 61).

**School Records**

On October 5, 2004, administrators and teachers at Massillon City Schools completed an Evaluation Team Report (ETR). (Tr. 273-75). The ETR indicated Plaintiff had been placed in the Developmentally Handicapped (DH) Resource room since first grade. (Tr. 279). After repeating third grade, he was identified as having a developmental handicap. (Tr. 279). Ms. Seikal said, "[Plaintiff] is a really hard worker. He tends to shut down when work is difficult and will rarely ask for help, so it is important to monitor him frequently during class." (Tr. 275). Previous ETR reports showed Plaintiff's cognitive abilities were in the extremely low/borderline to low average range, with prior IQ scores of 69, 75, and 81. (Tr. 279).

The ETR team believed Plaintiff continued to function in the borderline range. (Tr. 279). Plaintiff's test scores revealed he read at a second grade level with math scores in the low/deficient range. (Tr. 280). Plaintiff was "cooperative during the testing session but displayed minimal perseverance." (Tr. 280). Plaintiff "told the examiners he was tired, but teachers also report[ed] poor work skills." (Tr. 280). When asked about future plans, Plaintiff indicated he wanted to get a job working with people and computers. (Tr. 282). The ETR team concluded Plaintiff continued to meet the definition for DH, thus he continued to be eligible for special education services. (Tr. 281).

On April 7, 2006, Plaintiff met with school officials to discuss his Individualized Education Program (IEP). (Tr. 284-96). The IEP indicated Plaintiff had no problems with speech

4

and language or social, emotional or behavioral functioning. (Tr. 285). He had mild/moderate intellectual functioning but his strengths were his abilities to follow instructions and work independently. (Tr. 285).

**<u>Vocational Program Records</u>**

On February 12, 2007, Kelley Greaves provided a Community Based Evaluation Report for the Bureau of Vocational Services (BVS). (Tr. 461). Plaintiff was placed at Pet Supplies Plus for this evaluation. (Tr. 462). Plaintiff was on time each day and completed all scheduled shifts. (Tr. 462). Plaintiff asked his job coach if he could be placed at a video store next time "where there [was] less to do!" (Tr. 462). Ms. Greaves biggest concern was Plaintiff's lack of self-motivation. (Tr. 463). Plaintiff performed best when working with a coworker as he worked poorly when left to work without someone telling him what to do. (Tr. 463).

Plaintiff was observed as lazy and needing regular reinstruction to continue working. (Tr. 463). When told he would be fired from any job he had if he didn't work hard, Plaintiff merely shrugged his shoulders. (Tr. 463). Plaintiff was asked three times to get a cart from the parking lot but "did not move." (Tr. 463). Despite this, Plaintiff's work quality was good. (Tr. 463). His job coach noted "[Plaintiff] CAN do the job, and do it well, and do all that [was] asked of him, however [Plaintiff] didn't WANT to do the cleaning and it was clearly apparent to [the job coach]." (Tr. 463).

Plaintiff was able to comprehend what was expected of him with very little reinstruction. (Tr. 464). He was interested in secondary activities such as watching sports, playing video games, and watching movies. (Tr. 464). The job coach concluded Plaintiff would work best with a manager who did not tolerate laziness. (Tr. 464).

On March 29, 2012, Jen Londo from Vocational Guidance Services filled out a Placement Services Report. (Tr. 306-11). Plaintiff indicated his vocational goal was to work in computer repair. (Tr. 306). The report showed Plaintiff had the abilities to learn new tasks with time and patience, retain instructions with repetition, accept supervision, relate to staff and peers, cooperate, accept criticism, complete work assignments with assistance, and show initiative. (Tr. 307-08). Plaintiff's abilities to attend to task and sustain concentration needed improvement and he needed some assistance following written instruction. (Tr. 308).

Plaintiff was paired to work with Digital Jet Stream and failed to show up for his first day of work because he "over slept." (Tr. 310). After the first day, Plaintiff showed up on time for every shift, never left early, and never called off. (Tr. 310). Plaintiff "appear[ed] to be very interested in computer repair" and after breaking the ice with the owner, took initiative to assist with computer repairs. (Tr. 310). Plaintiff's boss found he had aptitude to learn computer repair in a supportive environment with repetition. (Tr. 310). Plaintiff also demonstrated an ability to accept supervision and constructive criticism. (Tr. 310).

**Ohio Department of Corrections**

Plaintiff's initial mental health screening revealed no history of mental health treatment and no medication treatment. (Tr. 391). Plaintiff had no suicidal thoughts, emotionality, depression, or unusual presentation. (Tr. 391-92). Plaintiff denied depression or emotional problems. (Tr. 394). A mental status examination revealed Plaintiff had average intellectual functioning, good concentration, stable mood, intact memory, and full orientation. (Tr. 406). Based on this examination, Plaintiff was not referred for further mental health treatment. (Tr. 407). Plaintiff did complain he needed medication for ADHD. (Tr. 409-10). On January  24,

6

2011, Plaintiff reported he had depression issues and was "sad all the time." (Tr. 418). The nurse noted his depression seemed situational and he "may be med[ication] seeking." (Tr. 419). On June 7, 2011, Plaintiff's medical release summary indicated no history of suicide attempts and that Plaintiff had no special needs on release. (Tr. 371).

**Opinion Evidence**

On November 23, 2009, Frank Orosz, Ph.D., reviewed the evidence, completed a Psychiatric Review Technique, and indicated there was insufficient evidence to evaluate Plaintiff's claim. (Tr. 318-30). He noted Plaintiff was sent two letters and did not respond. (Tr. 330, 341).

During a physical consultation on November 9, 2011, Naomi Waldbaum, M.D., found Plaintiff was capable of performing many different types of work-related activity but "in a sheltered setting if his intellectual capabilities [were] limited." (Tr. 360).

On August 25, 2011, Plaintiff met with clinical psychologist Richard C. Halas, M.A., for a psychological evaluation for the BVS. (Tr. 435-41). Plaintiff indicated he was applying for services from BVS to secure job training and obtain employment. (Tr. 435). Plaintiff graduated from high school in 2008 after taking a mix of regular and special education classes. (Tr. 436). Despite reporting severe back pain on his disability application, Plaintiff "describe[d] his overall physical health [w]as . . . good." (Tr. 436). Plaintiff was cooperative but presented with a flat, hesitant, and tentative disposition. (Tr. 436). Plaintiff had significant poverty of speech, which was slow, but no fragmentation of thought. (Tr. 437). He denied depressive symptoms and said his energy level was good. (Tr. 437). Plaintiff said he cooked, watched movies and sports, and had lots of friends. (Tr. 438).

7

Dr. Halas administered the Wechsler Adult Intelligence Test IV, which revealed a full scale IQ score of 70. (Tr. 438). Plaintiff also tested in the second percentile for the Wide Range Achievement Test IV. (Tr. 439). Overall, Plaintiff tested in the low or moderately low range.

Dr. Halas concluded Plaintiff was normal with a below average intelligence level. (Tr. 438). He noted Plaintiff's "intellectual deficits place some restrictions upon his long term vocational potentialities." (Tr. 440). He diagnosed Plaintiff with borderline intellectual functioning, mixed personality disorder, depressive disorder, and assigned a Global Assessment of Functioning score of 45, which indicated serious symptoms. (Tr. 440-41).

**ALJ Decision**

The ALJ found Plaintiff had the severe impairments of borderline intellectual functioning, depressive disorder, and personality disorder. (Tr. 23). The ALJ then concluded Plaintiff did not meet or equal any listed impairment, including listing 12.05. (Tr. 25-26). In doing so, the ALJ found Plaintiff did not meet the listing because Plaintiff could care for his personal needs, there was no proof of deficits in adaptive functioning, and his IQ scores represented borderline intellectual functioning, as opposed to mental retardation. (Tr. 26). Later in the opinion, the ALJ discussed Plaintiff's history at length, including testimony, opinion evidence, school records, incarceration treatment notes, and vocational assessments. (Tr. 27-30). The ALJ noted Dr. Halas and Plaintiff's mother reported Plaintiff had symptoms of depression; however, the ALJ found there was no evidence that Plaintiff sought mental health treatment and his failure to do so suggested his symptoms were not as severe as alleged. (Tr. 31).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

9

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id*. The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id*. Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred by finding he did not meet listing impairment 12.05(C) – intellectual disability.[1]

**Listing 12.05(C)**

A claimant can demonstrate he is disabled by presenting "medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). The diagnostic description of intellectual disability in 12.05 refers to

---

1. Intellectual Disability replaced the term Mental Retardation in listing 12.05(C) effective August 1, 2013. 78 FR 46499-01 (Aug. 1, 2013).

"significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpt. P, § 12.05.

To demonstrate intellectual disability, formerly termed mental retardation, a claimant must establish three factors to satisfy the diagnostic description: 1) subaverage intellectual functioning; 2) onset before age twenty-two; and 3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a claimant must also satisfy "any one of the four sets of criteria" in listing 12.05. *See Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05(C) requires a claimant have a valid, verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, § 12.05(C).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). However, a reviewing court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6; *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). Important here, the court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

11

Here, Plaintiff first argues the ALJ's analysis of 12.05(C) was flawed because he referred to "proof of deficits in adaptive functioning," as opposed to deficits in adaptive functioning initially manifested *before age 22*. (emphasis added). Plaintiff was 24 years old at the ALJ hearing. Notably, nearly every piece of evidence in the record was dated before Plaintiff was 22 years old. Plaintiff also takes issue with the ALJ's reliance on the BVS job report from Plaintiff's employment at Pet Supplies Plus. However, Plaintiff was 18 at the time this report was taken. Moreover, Plaintiff is simply incorrect to assert that the ALJ exclusively relied on this one BVS report. To the contrary, the ALJ discussed Plaintiff's medical, vocational, educational, and daily activity background extensively when concluding Plaintiff was not disabled and made sufficiently clear his reasons for doing so. *May*, 2011 WL 3490186, at *7; (Tr. 27-30). The fact that the ALJ discussed this evidence after his listing analysis is irrelevant. *Snoke*, 2012 WL 568986, at *6 (a reviewing court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis).

Plaintiff further argues the ALJ failed to consider Plaintiff's learning disabilities and developmental handicap with respect to deficits in adaptive functioning before age 22. This is also inaccurate. The ALJ considered and discussed Plaintiff's educational and vocational histories at length. (Tr. 28). The ALJ stated, "[s]chool records show that [Plaintiff] was enrolled in special education services for the developmentally handicapped." (Tr. 28). The ALJ went on to note Plaintiff's IEP program and vocational assessments. (Tr. 28-29). Indeed, the Sixth Circuit "has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009).

Here, as the ALJ pointed out, the evidence fails to show deficits in adaptive functioning prior to age 22. Instead, the evidence reveals Plaintiff had capable and effective social, communication, and daily living skills. Plaintiff graduated high school, played video games, watched movies, cooked meals, had many friends, and performed household chores. (Tr. 54-59, 437-38). Plaintiff's mother testified he could live on his own but needed help paying bills. (Tr. 60). Plaintiff's employment coach said Plaintiff's biggest obstacle was his lack of motivation. (Tr. 463). Indeed, while working at Pet Supplies Plus, Plaintiff requested to work at a video store "where there [was] less to do[.]" (Tr. 462). Despite this, his work quality was good, his speed was average, he was physically capable, and he was able to comprehend instructions. (Tr. 464).

Next, Plaintiff argues the ALJ erred because he failed to consider Plaintiff's low IQ in conjunction with "a physical or other mental impairment imposing an additional and significant work-related limitation of function." § 12.05(C). Plaintiff asserts depressive disorder is the additional and significant work-related limitation which qualifies him for the listing. (Doc. 15, at 13-14). First, while Plaintiff had some qualifying IQ scores of 60 through 70, the ALJ correctly noted he was diagnosed with borderline intellectual functioning, not mental retardation. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (highlighting that the plaintiff was diagnosed with borderline intellectual functioning, not mental retardation); *see also Shultz v. Comm'r of Soc. Sec.*, 2013 WL 5739700, at *7-8 (N.D. Ohio). Second, substantial evidence supports the ALJ's conclusion that depression was not a significant work-related limitation.

Here, the ALJ correctly found "there is no evidence that [Plaintiff] has sought mental health treatment" and his "failure to seek treatment suggests that these symptoms are not as severe as he has alleged." (Tr. 31). Indeed, the record clearly reflects Plaintiff denied depression

13

or suicidal thoughts during or before his alleged onset period. Plaintiff's school records showed he had no issues with social or emotional functioning. (Tr. 285). Plaintiff's incarceration treatment notes revealed he denied depression, emotional problems, or suicidal thoughts on numerous occasions, and he was not referred to mental health treatment. (Tr. 391-92, 395, 399, 406-07). On one occasion, Plaintiff reported he was "sad all the time." (Tr. 418). However, the nurse noted this depressive symptom was situational and that Plaintiff "may be med[ication] seeking." (Tr. 419). While Dr. Halas diagnosed depressive disorder, Plaintiff had never sought treatment or took medication for depression. (Tr. 440). Moreover, Plaintiff himself denied depressive symptoms during his examination with Dr. Halas and said his energy level was good and he had lots of friends. (Tr. 437-38). Plaintiff hangs his hat on one depression diagnosis by a consultive examiner to claim he meets listing 12.05(C) in conjunction with low IQ scores. However, the evidence, or lack thereof, simply does not support Plaintiff's claim, and certainly is insufficient to undermine the substantial evidence supporting the ALJ's finding.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

    s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the

specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).